Good morning, Your Honors. My name is Karen Bucher. I represent Leigh Hammonds, the petitioner, appellant. And with the Court's permission, I'd like to reserve three minutes for a rebuttal. Okay. Try to keep track of your time. We'll try to help you. And if you can keep your voice up, that would be useful. Thank you. This is the case where the bartender was shot. And Mr. Hammonds' defense was he was not the shooter, and that a third party, Ernest Salcido, was the actual shooter. And trial counsel was ineffective for many reasons cited in the brief. But the most striking error to me is that he failed to interview the other bar patrons that were witnesses that witnessed the shooting, in particular Juanita Perez. Had trial counsel interviewed Juanita Perez, he would have learned that she identified him in a photo lineup. And the State Court... She identified him. Who's him? Excuse me. Ernest Salcido Jr. as the actual shooter. That is to say, just to make sure, if this interview had taken place, we would have learned or he would have learned that the identification had been of the other person who Hammonds claimed did the shooting. Correct. But she identified Salcido Jr. as the shooter, and she identified somebody else as a possible shooter, too. Your Honor, that's incorrect, and that's the most important part of my case. This is the breaking part of my case, and I really would like to clearly highlight this. I'm having difficulty hearing you. Would you put that microphone closer to your voice? I'm glad that you brought that up, because that this part is the most important part of my case. It's the breaking part. The State Court found that she identified more than one people as the shooter. But if you look at the record, that's not what happened. We know this, because at the end of the trial, the prosecutor asked the judge, before the exhibits went into the jury, to white out Ms. Perez's signature behind Ernest Salcido's picture, because she identified him as a shooter, and his reason was, well, it was irrelevant, because she didn't testify that he was the shooter, so let's white it out, her signature. Then on the other pictures ---- In that colloquy, though, between the court and counsel at the end of the case when they're going over exhibits, there was no direct reference to Junior, Salcido Junior, I'll refer to him as Junior, as being the shooter. There's a colloquy that Perez has identified Junior and one other. That's what the transcript provides, and one other. But we don't know, reading the record, from the record, that that identification was actually of Salcido as the shooter, as opposed to Salcido an accomplice or Salcido for any other reason. It does. Officer Dorecott testified at a later part of the proceedings. He's the one that showed the photo lineups to the witnesses. His procedure ---- He showed the photo lineup to ---- To all the witnesses. Okay. From my reading of the record. He says he has the witness sign the name behind the picture of the shooter, and initial, the remainder of photographs, presumably to keep track of which photographs were shown. The initials were the ones of the person who wasn't the shooter, and the signature identifies the shooter. And that's what happened with Mrs. Perez. She signed behind Junior her full signature. According to the officer, that means that's the person she identified. The other photograph ---- Does that hold up when the officer asked Chavez, Mr. Chavez, to sign, to put his signature on? Exactly. That's where I get the testimony from. He was testifying regarding Chavez. But in the colloquy, when the officer is testifying with respect to Chavez, the officer testifies that Chavez at first thought that Salcido was the shooter, but by the end of that very short interaction between the officer and Chavez, Chavez is saying, I don't know. Those are the last words out of Chavez's mouth, and the officer says, well, that's okay. I had him go ahead and sign it anyway. My reading of the record is that the officer felt that Chavez had identified Junior as the shooter. So he had him sign Salcido's picture. That's your interpretation of the record. I read it over and over again, and it comes quite clear. Do you have to read it over and over again in order for it to be clear? Well, sometimes you do, and in this case, I had to, because they made it real clear that the person, the shooter, the witness signs the full name, and the other picture that's not the shooter is the initial. So in this case, what happened, Ms. Perez, she signed her name behind Junior's picture. That's the person she identified as the shooter. Well, not initially. That was later, but initially, in her contact with police, she identified Hammonds as the shooter by description. The description she gave related to Hammonds. It didn't relate to Junior. The description she gave to the police was the shooter was a male Samoan or Hawaiian with black hair, combed back with a three-inch ponytail. The description given by the bouncer, Fred Vivalu. Which was the strongest of all the descriptions. The jury had felt so, had a different description. And Ms. Perez's description of Junior matches the description by Chavez. Hawaiian, Samoan, the hair back with the three-inch ponytail. And one of the things that I've learned, I was the attorney on Rice v. Collins. I was Mr. Collins' attorney. And one thing I learned from that case going to the Supreme Court, if the facts are debatable, then you are stuck with the state court decision. I'm sorry, I couldn't hear you. If the facts are debatable, and then I lost you. Then you're stuck with the state court findings. You have to show that the facts go one way, that they're not debatable. And I feel in this case, the facts are very strong that Ms. Perez identified Junior as the shooter. And because she signed her name on it, behind his picture. And she initialed the remainder of the photographs. And had the jury known that, that would have diminished Fred Babaloo's testimony. He identified Mr. Hammonds as the shooter. And the jury was having trouble. They asked for a readback two times of his testimony. Once he specifically asked for the part where he identified Mr. Hammonds as the shooter. Let me go with you this far. Let me assume, then, for the purpose of this question, that in fact she did sign on the back, thereby signifying that she had identified Junior at the lineup. What legal claim does this fit into and how? Well, there's two. The fact, had Mr. Hammonds' attorney interviewed her, he would have found this out. And he would have put her on the stand. And she would have said Junior was the shooter. And Ms. Perez would have been a very good witness. Because she actually called the hospital and said, I was there. I saw the shooter. I can identify him. Then she went to the hospital and she waited outside in the parking lot. At some of the point later. Did you say Ms. Perez was a very good witness? Was a very good. During the trial? She would have been a very good witness. She would have been a good witness if she had been called. Correct. Because she made the phone call to the hospital. And she told the doctors, I can identify the shooter. Have the police call me. And she also went to the hospital parking lot. She was there. And at some point in time, I don't know when, but the police did interview her. And she gave a description of the shooter. And she said, I can identify him. My point is, is that Mr. Hammond's attorney did not interview her. Had he interviewed her, he would have found out that she identified him. Put her on the stand. And it would have created reasonable doubt as to my client. Especially since it would have diminished Fred Babalu's testimony. Okay. So that's an IAC claim. Yes. And you said there were two legal claims that were going to fit into that. Well, there's two IAC claims. The second one. The IAC claim has two parts to it. One, deficient performance. And the other, prejudice. That's correct. To show prejudice, you would have had to show that Juanita Perez's testimony would have changed the result, in effect. Right? Yes. I think it would have diminished Fred Babalu's testimony. He testified he saw the shooter. Right. Had. But there were other elements to Juanita Perez's testimony, which we haven't mentioned yet. Didn't she also testify that she had consumed five to six beers prior to shooting? She stated that in the police report. And then didn't she testify that didn't she give a statement to the police that the shooter was a male Samoan? Yes. Mr. Hammond was not Samoan. That's my point. That's exactly my point. That she saw the shooter. Was Salcido a Samoan? You know, if you look at his pictures on ER 100, arguably someone could interpret him as a Hawaiian or Samoan. As a what Samoan? A Samoan. Okay. He said another word, but I didn't hear it. Hawaiian. Oh, I see. And the second issue is, once at the end of the trial, when the prosecutor wanted to hide her identification of Junior as the shooter, this should have alerted trial counsel to say, wait a minute, there is a connection of Junior and the shooting, and renewed his motion to introduce third-party culpability evidence that Ernest Salcido was the shooter. Do we have a picture in the materials in front of us? I confess I have not seen it, but it may be there. Is there a picture of Junior? Yes, I believe it's ER 100. Okay. According to the record, that is the picture that she signed. And do we have a picture of Hammonds? No, Your Honor. Okay. This is the exhibit that the prosecutor asked the court to hide her signature, because she had signed her name behind it as the shooter. But the reason I want to see the picture is to see whether it's plausible that she might have stated that he was a Samoan. Okay. And, you know, but also Mr. Hammond is half Caucasian, half Hispanic. Yes, I know. But we don't have a picture of him in the record. No, we don't. Okay. And as I recall ñ Do we have any evidence as to whether or not Junior had a ponytail at that time? I don't believe that was in the record. I can't recall if that was in the record. And we know that Mr. Hammonds has a ponytail later that's longer. Very long, 15 to 18 inches. And how much time has elapsed between the time of the shooting and the time we know of this longer ponytail? The shooting was on March 31st, 1996. The trial was late July 1997. So the question is how long is that hair going to grow in a little over a year? That is a question. I can't tell if you're there. Ms. Bikur, I know that this point is your most critical point. You've identified it as such. If I can draw your attention back to the end of the trial, once again, when the attorneys are going over the exhibits, there's an interesting colloquy where Hammonds makes a reference ñ excuse me, Hammonds' attorney makes a reference to the names of some witnesses and a request that he had, an earlier request that he had, that these witnesses not be allowed to be called by the prosecution. Do you remember that? No, I don't. Okay. There was a colloquy there as they were going over the exhibits. And as I recall, there was a reference that counsel had made an effort not to have the prosecution call certain witnesses. What I deduced from that was that these witnesses, including Peraz, I think, would not be helpful to Hammonds. But if you don't recall that, that's fine. I don't want to put you on the spot. But there is one thing I do recall that might answer that. There was a point at the end of the trial that, it's on ER 298, Mr. Hammonds' attorney mentioned to the court that the government had turned over the police report of Juanita Peraz later on in the trial when it was almost over. And he admitted, had he known about this, that she had pointed out Junior as a shooter, there may have not been a conviction. And that's between ER 296 to 298. And also, this error was also amplified by the fact that during opening statements, defense counsel mentioned to the jury that he will bring forth witnesses that didn't, that said that Mr. Hammonds was not the shooter. And if there's no other questions regarding that part of the case, I'd like to talk a little bit about the third-party evidence. Mr. Hammonds was prevented from presenting his complete defense. He wanted to present evidence that Junior was the actual shooter because he came to the bar to collect a million-dollar debt owed to his father. And without this evidence, there was an escaping hole before the jury. What did this note mean? What was the significance of it? And the evidence would have filled that gap, and the jury would have understood why the note was given. And the State court found that that evidence was too speculative in order to be presented in this third-party defense. And when you look at the record, it wasn't speculative because Nicky Diaz, the owner of the bar, knew details about Salcido Sr.'s, the father's, death that no one else knew or that the public didn't know, that he was shot execution-style in a lettuce field. And he also, Diaz also told the police that Junior was killed during a million-dollar counterfeiting deal. What evidence was there that Salcido Sr. was killed by Diaz, the bartender? There was no evidence that Diaz killed him, but he was somehow, the evidence was he was somehow connected. Somehow. How was he connected? I mean, the only evidence was that Salcido Sr. had given $500 or $600 to Nicky Diaz to start his bar, and Nicky Diaz paying him back $50 every now and then when the older Salcido would come in for a drink. Then all of a sudden, there's a million dollars in counterfeit currency that Salcido Sr. is involved with, and he's shot in the back of the head. All right? What does Nicky Diaz conceivably have to do with that? It starts off with a note. It starts off with the note, the demand note. Someone gave him the demand note, well, gave his bartender the demand note, Ernie Salcido Jr. The note got in evidence. Yeah, the million dollars. And what connects Nicky Diaz is, first of all, the note was given to at his bar, and that he knew all the details of the murder that the public didn't know. And what I think is very striking is that Mr. Diaz said he did not know Mr. Hammonds. He never heard of Mr. Hammonds, but he knew Salcido Jr. and Sr., and he also said in the police report, Nicky Diaz, that it's quite possible that Salcido Jr. was the shooter. So there's all this. He is very much connected to this evidence. Isn't that ultimately your argument, though? That's what you want to ultimately have introduced into evidence. Diaz's statement that, you know, I've been thinking about this, and it's quite possible that Jr. was the shooter, whereas the counterfeit scheme goes undetected for all those years, an eight-year period of time, and the murder of Sr. goes unsolved for all this period of time. I don't think there's any way a trial court is going to allow in the musings, the speculation of Diaz as to who might have, as to whether Jr. killed, not killed, but shot Leyva. What connects it is the note plus what the shooter said. Right before the shooter shot the bartender, he said, This is for Nicky. The shooter knew Nicky Diaz. And that combined with the note that said a million dollars. Did that come into evidence, this is for Nicky? Yes. The note came into evidence? Yes. So all of that's in evidence. The evidence is there for the argument to be made. However, that argument will be made relative to third-party culpability. The only evidence that was kept out was evidence of the murder, completely unsolved for eight years, and the million-dollar counterfeit scheme. So that's correct. And if you combine that with if Juanita Perez was testifying and she testified that Jr. was the shooter, it would have put all the pieces together. Why don't we hear from the other side? You've got about two minutes, and we want to make sure to save enough time for you to respond. Thank you. Good morning, Your Honors. Alison Alamon on behalf of the Family Justice Committee. And could I ask you the same thing to keep your voice up? I will do that. Thank you, sir. Okay. I am going to try to answer any of the Court's questions. I'm going to submit this on the briefing that I've done to specifically address counsel's argument regarding Ms. Perez. As the Court's already pointed out, Ms. Perez had signed the back of Salcido's. Two Ms. Perez's. You're talking about Jennifer, not Christine, right? I'm talking about the woman who signed the back of a photograph. Right. Okay. She also made another identification. And the district court. You're going to be talking about Juanita. You're not going to be talking about Connie. You're not going to be talking about Mr. Lowe. I'm talking about Juanita, sir. Yes, sir. Okay. Okay. I don't know how helpful that would have been to the defense case and how it would have helped for the defense attorney to follow that, because she didn't make one clear identification as appellant's counsel feels that she did. There were some clear identifications made that Hammonds was the shooter in this case. But didn't she sign one photograph of Junior and simply put initials on all the other photographs of the people that she recognized? Wasn't that what she was asked to do by the police, sign the photograph of the person you think was the shooter, but just initial the other photographs of people that you recognized? I believe so. However, I think she also identified one other person as possibly being the shooter as well. With a signature or just with initials? I don't know. I don't know about that point, Your Honor. You're not prepared to either agree or disagree with the characterization which counsel has given? I don't think that it is as strong an identification as counsel is arguing here. Now, let me pick you up on something you said. We know that she signed the back of the picture of Junior and that she initialed the others. And we know that the practice of the police who did that lineup was to have her sign the one that she identified as the shooter. You just said, I think she made some other identification. What do you mean by that? Well, actually, the district court has alluded to that as well. She made an additional identification. And what identification is that? What are you talking about? She signed the back of Salcido's. She also, I don't know if she signed or she initialed the back of another photograph, but she indicated that person could also have been the shooter. And what's your evidence for that? Well, it's in the record. I don't have the exact place where it's at, Your Honor, but even the district court was relying on that when they made their – when the judge, the magistrate judge made his findings and recommendations. I can point to the – it's in the findings and recommendations at page 20 and 21. Okay. Okay. If that will help, Your Honor. But the other identification you're referring to is another identification at that very lineup? Yes. And the findings and recommendations, I apologize for holding you up. That's okay. Where am I going to find that? Admittedly, sir, if I may, can I read the portion that I'm relying on? Yeah, sure, sure. Admittedly, Juanita Peraza – Now, where are you reading from? Well, I have set this out in my brief, but I am quoting – Okay. What page are you on in your brief, then? This is the order. Actually, the order that's adopting the findings and recommendation. Yeah. What page are you on? Okay. That is at – they're page 17 at line 5. This is your brief? I'm sorry. F page 5. It's AER 17, which is the document. The appellee's – when I put my documents into the record. So AER 17. Between F page 5. And it's nothing more than the August 24th – No, I'm sorry. I'm having trouble. It's in the AER. AER 17. I have AER right here. It's page 17? No, it would be – that's document number 17. It is the order of the district court that adopted the findings and recommendations that denied the habeas. Okay. So that's going to be on page 333. Well, I have – it's cited at page 5, Your Honor. If you bear with me a minute, I will get the order itself. I have it on the table. That would be useful. But I'd like to be able just to read along. Okay. I apologize for being difficult, but sometimes it's easier for me if I've got something in front of me. Let's see here. We'll find it. I think what you're after – you're in the second volume. Your Honor, please forgive me. This is at page 22 of findings and recommendations. The court discusses the potential importance of Juanita Perez's identification. May I read this for you, sir? Well, where do I find it in the excerpts of record? Excerpts of record? The excerpts of record, well, it is an excerpt of record that the petitioner and the appellant put into the court. And I'm not quite sure on what number there is. Can you help on this? PR-371. PR-371. I only recall it as the document from the court, sir. Judge Drozd, findings and recommendations. Okay. I'm on – it's the page – ER-371, and it's page 22, is that right? 22. Okay. Where do I look on page 22? Start at line 3, sir. Okay. The potential importance of Juanita Perez's identification. From the photo line, I was diminished by the fact that she also selected another person as the possible shooter. In addition, she had been drinking. She had been drinking. These are all – these are all issues that you yourself have raised or that the court has raised this morning. She had five or six drinks, and there was an additional identification that was made. So, you know, it's actually – I'll submit to the court, it's rather speculative that she would have been that helpful of a witness for the defense in this case, especially in view of other clear identifications that were made that Hammonds was the shooter by other bar patrons. There were three other patrons that testified, and there was very strong evidence of identification. I don't believe that Ms. Perez had counsel further talk to her and decided to pursue this witness. I don't believe it would have been that helpful at all, Your Honor, and I don't believe the absence of that resulted in prejudice to Mr. Hammonds. Okay. Are there any additional questions that I can help the court with? I'm going to submit it. Thank you, sir. Response? I'll be very brief. The district court judge got that information from the state court findings that Ms. Perez identified more than one shooter. It's in the state court decision, and that's what I'm trying to show is not accurate by the record. And if I have the record, it's not supported by the record that she identified more than one person as the shooter. The district court judge put that information in his or her report and recommendation because that's what the state court opinion said. But I found the quality right here, and I would just like to read a couple passages that I think would clear this up. I've got the state court, which says Juanita Perez-Perez made two statements. She made two identifications. Neither of them was petitioner, while one of them was junior. Okay. Correct. And that's where I believe the district court judge got that. The magistrate judge got that, yeah. Yes. Okay. But you're saying somehow that this statement by the state court judge is wrong? Right. That's the whole point of my argument. Okay. And how do we know if the state court judge is wrong on that point? Page 296. Except the record 296. Excuse me. Okay. Hang on a second. My slowness will not count off of your time. Okay. Okay. I'm on page 296 of the ER. Okay. Line 21? Line 21. Court, was there something you wanted to cover in the back of something? There is. The signature? On the back of 44D, which is the ñ can I see that, counsel? And the prosecutor says, which is the driver's license photograph of Ernest Salcido? That's the ER-100 we were just looking at? Yeah. Is the signature Jay Perez, her signature? There's been no testimony about Mrs. Perez viewing the photographic lineup. Her ñ this is the key point. Her initials are on the other photographs, and I'm not so concerned about that. Right there. It says her signature was only on that one, Junior's. Her initials were on the rest. And is there anything else that the State trial judge could have based his conclusion on when he says she identified two people? No. Only one of whom was Junior? I think it was from right here. This is the only place where I could think of where the State court found those findings of fact which are contrary to the record. I read through the entire record, and I could not find anywhere where Mrs. Perez identified. Okay. This is out of the ordinary ñ out of the regular order. But if I could ask you to sit down for just a minute, let me ask the State. Is there anything that you can point us to ñ please come up to the podium. Is there anything that you can point us to in the record that does support the State court finding that Mrs. Perez identified two possible shooters, one of whom was Junior? Not ñ I don't have that reference offhand, Your Honor. I wish I had brought the entire court's transcript with me. And ñ Do you think you could supply that evidence, that reference, if you had time? Yes. I'll go back to the office, and I will find it. Because ñ I mean, I don't have the record with me here. I mean, I came with pleadings. This is a very large, voluminous record. But it didn't even come with the excerpts of record? I have ñ I have counsel's excerpts of records. We didn't file ñ we didn't file the transcript, Your Honor. That comes to the Ninth Circuit Court of Appeal from the district court. When I ñ I lodged it with the district court. All right. So ñ But I have a big ñ Let me make sure I understand. You're saying that, as far as you're aware, there's nothing in the excerpts ñ Nothing in the excerpts of record. That supports the State trial judge's finding. But there may be something in the full record? I believe there is something in the full record. Because I don't think that the ñ I don't think Judge ñ neither the Third District Court of Appeal nor Judge Droz pulled this out of the air. I think that they ñ I'm very certain that there is something that I remember reading that supports that. It's not in the excerpts, which is a very condensed version that supports some specific arguments, but not this one. Okay. Now, I'm telling you something you know. You have the ability to compile your own excerpts to give us that would help out what you're trying to say. Yes, sir. Yes, sir. And that was not something that I submitted to the Court because ñ I'm sorry. I apologize. I did not feel ñ Well, listen. If we can do it this way, if you could, within a week ñ Within a week. Please send us any evidence, a reference to the record, and then quote it. Okay. And then I'll ask you to put it in a letter that supports the trial judge's finding that she identified two rather than one. Okay. Yes, Your Honor. As the shooter. As the shooter. I will do that, Your Honor. And I will submit it to you in writing before a week ñ a week from today. At the latest, a week from today. Okay. And then I'll ask you ñ I'll give you ñ you probably don't need much time, but I'll give you a week to respond. Thank you, Your Honor. Okay. Okay. Thank you, Your Honor. Any further ñ any further questions from the bench? Okay. Thanks very much. The case of Hammonds v. McGrath is now submitted for decision. Does either of you need a break? Okay. The next case on the argument calendar is Thompson v. Paul.
judges: Fletcher, Bea, Miller